PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

v.

ROBERT KENNEDY, JR.,
        *Defendant-Appellant.*

No. 02-4917

Appeal from the United States District Court
for the Western District of Virginia, at Roanoke.
Jackson L. Kiser, Senior District Judge.
(CR-02-56)

Argued: January 21, 2004

Decided: June 24, 2004

Before WILKINSON, MICHAEL, and SHEDD, Circuit Judges.

_____

Affirmed by published opinion. Judge Wilkinson wrote the majority opinion, in which Judge Shedd joined. Judge Michael wrote a dissenting opinion.

_____

## COUNSEL

**ARGUED:** Randy Virlin Cargill, MAGEE, FOSTER, GOLDSTEIN & SAYERS, P.C., Roanoke, Virginia, for Appellant. Joseph William Hooge Mott, Assistant United States Attorney, Roanoke, Virginia, for Appellee. **ON BRIEF:** John L. Brownlee, United States Attorney, Brian Samuels, Third Year Law Intern, Roanoke, Virginia, for Appellee.

**OPINION**

WILKINSON, Circuit Judge:

Appellant Robert Kennedy, Jr. was convicted in August 2001 of drug trafficking in Virginia, and he was sentenced to 420 months' imprisonment. While his conviction was pending appeal, Kennedy was brought to testify on two separate occasions before a grand jury that was investigating drug and money laundering activities in the Danville, Virginia area. He was subsequently indicted for perjury based upon his testimony. He filed a pre-trial motion to suppress his perjurious statements, claiming that they were obtained in violation of his Fifth and Sixth Amendment rights and were the result of prosecutorial misconduct. The district court rejected his claims, and a jury convicted Kennedy of four counts of perjury.

On appeal, Kennedy contends primarily that the district court erred in denying his constitutional claims for suppression. We hold that his remedy for any Fifth or Sixth Amendment violations does not encompass exclusion of his false testimony from his perjury trial. Courts cannot condone perjury as a self-help remedy against constitutional violations. *See United States v. Mandujano*, 425 U.S. 564, 576-77, 582-83 (1976) (plurality opinion). In addition, there was insufficient evidence here of prosecutorial misconduct amounting to a deprivation of due process. Kennedy's testimony was therefore admissible at his prosecution for perjury, and we accordingly affirm the district court's judgment.

I.

A Virginia jury convicted Kennedy of two counts of distributing cocaine base, and one count of conspiring to distribute five kilograms or more of cocaine and fifty grams or more of cocaine base. Kennedy filed a notice of appeal from his conviction on January 23, 2002.[1]

---

[1] A panel of this Court later affirmed Kennedy's drug conviction and sentence on September 23, 2002. *See United States v. Robert Kennedy, Jr.*, No. 02-4072 (4th Cir. Sept. 23, 2002).

While his appeal was pending, on February 19, 2002, Assistant United States Attorney Joseph Mott had Kennedy brought before a grand jury sitting in Roanoke, Virginia. The focus of the grand jury investigation, according to the United States, was to probe drug trafficking and money laundering offenses in the Danville, Virginia area. The specific purpose of Kennedy's appearance was to elicit information about other individuals dealing drugs in Danville, and about certain land transactions in which Kennedy was involved. According to the United States, Kennedy was not a target of the investigation. Mott claims that he notified Kennedy's trial attorney, Christopher Kowalczuk, that Kennedy would appear before a grand jury on February 19. Kowalczuk did not show up for the proceeding, however, and Kennedy disputes whether Mott ever notified Kowalczuk of the grand jury appearance.

Before appearing in front of the grand jury on February 19, Kennedy was first interviewed in the U.S. Marshal's Office in the Roanoke federal building. Mott, Detective Thomas Merricks of the Danville Police Department, and Sergeant T.L. Nicholson of the Pittsylvania County Sheriff's Office were present for the interview. Mott began by advising Kennedy that "since he had been convicted of the drug charges, . . . he did not have a right not to testify about those charges" before the grand jury. However, Mott informed Kennedy that he could refuse to discuss other matters for which he had not been convicted. Mott also advised Kennedy that he could consult with his attorney outside the presence of the grand jury before answering any questions, but that his attorney could not enter the grand jury room with him. Mott told Kennedy about the grand jury proceeding and about the oath, and he made clear that any material false statements under oath constituted the crime of perjury. Upon completing these instructions, Mott left the room.

After Mott's departure, Kennedy told the remaining officers that he "would never talk about [his connections] before the grand jury and that he would just pull his 35 years." The officers did not give Kennedy any *Miranda* warnings, but continued to question him about who "he dealt with." During the course of further interrogation, Kennedy identified a number of individuals from whom he had bought drugs, to whom he had sold drugs, or with whom he had conducted land deals. Throughout the discussion, according to Merricks, Ken-

nedy repeated several times that "he didn't want to talk" before the grand jury and that he would just serve his time.

When Kennedy appeared before the grand jury, Mott addressed him once again. Mott stated that "now that you've been convicted and sentenced, do you understand that you don't have the right to refuse to answer any question about the events that you've already been convicted of?" Mott clarified that "because you've been tried and convicted . . . in the drug case, on the indictment[,] . . . I'm telling you that you've lost your Fifth Amendment right not to testify about those events charged in the indictment." Mott stated, however, that "if there were other offenses, anything you say could be used against you." Mott again told Kennedy that although his attorney could not be present in the grand jury room, Kennedy could consult with him outside the room before answering any question. Finally, Mott reminded Kennedy that he was under oath, and he made clear that "any material false statement under oath constitutes the crime of perjury." Kennedy acknowledged that he understood these rights.

Mott then questioned Kennedy about his involvement with drugs, specifically probing Kennedy's sales of cocaine powder. Kennedy admitted selling cocaine to various people, including Ruth Guy, Wayne Huffman, and Bobbi Brandon. When asked about the sources of his drugs, Kennedy requested to speak with counsel. Mott passed over that subject and inquired instead about Kennedy's involvement with certain land transactions. After extensive questioning on this topic, Kennedy again requested to speak with counsel. Mott therefore excused Kennedy from the hearing, saying that he would continue Kennedy's appearance until next month and that he would "make arrangements for" Kennedy's attorney to be there.

One month later, on March 19, 2002, Mott again had Kennedy brought before the grand jury in Roanoke. Officers again began by questioning Kennedy in the U.S. Marshal's Office. Mott, Merricks, Nicholson, Special Agent Montie Blakey, and Special Agent Rick Elgin of the state police were present. Once again, Mott advised Kennedy that he had no Fifth Amendment privilege as to the events for which he had already been convicted, and at no time was Kennedy read *Miranda* warnings. When questioned by the investigators, Kennedy reiterated his desire not to talk to the grand jury, and he claimed

not to remember anything about his February 19 testimony. According to the notes prepared by Blakey, Kennedy asserted that "he did not know anything and just wanted to do his time. . . . [W]hen asked about information he gave at an earlier interview, [Kennedy] advised he didn't remember." Kennedy's new attorney, Randy Cargill, who had become counsel on March 14, 2002, was not present. According to Cargill, neither he nor Kennedy's former counsel, Kowalczuk, was ever notified of the March 19 grand jury appearance, and neither was present for it.

Once before the grand jury, Mott informed Kennedy that he had lost "the right not to incriminate [him]self as to those matters of which [he'd] been convicted," but he clarified that Kennedy could refuse to testify about "new crimes or other matters . . . than the events charged in [the] indictment." Kennedy acknowledged that he had met with his former attorney, Kowalczuk, since his last appearance on February 19. Mott then reminded Kennedy that he still had the right "to consult with an attorney [outside the presence of the grand jury] prior to answering any question." Finally, Mott told Kennedy again that he was under oath, and "the legal significance of that is that any material false statement under oath constitutes the crime of perjury."

Mott then began questioning Kennedy. He asked whether Kennedy had sold drugs to the individuals whom Kennedy had named in his February 19 appearance, but Kennedy stated that he did not remember selling to any of them. Indeed, Kennedy claimed that he could not remember ever buying or selling drugs in Danville. During this exchange, Mott reminded Kennedy about his oath and the consequences of making false statements, which included a "false claim of no memory," and he clarified that Kennedy had no condition that would affect his memory. Mott then inquired extensively about the land transactions to which Kennedy had previously testified. Mott concluded the proceeding by reminding Kennedy again about the consequences of giving false testimony, and he gave Kennedy a last chance to change his testimony. Kennedy refused, however, and Mott excused him.

On May 21, 2002, Kennedy was indicted on four counts of perjury before the grand jury on March 19, and one count of perjury before

the grand jury on February 19. Count 1 was based on allegedly false statements Kennedy made on March 19 that related to his general drug activities, but the district court dismissed this count due to a lack of evidence of falsity. Counts 2, 3, and 4 stemmed from alleged inconsistencies between Kennedy's testimony on February 19 and his testimony on March 19. Specifically, Kennedy admitted on February 19 that he had sold drugs to Ruth Guy, Wayne Huffman, and Bobbi Brandon, but he stated on March 19 that he could not remember selling drugs to any of them. Count 5 involved Kennedy's February 19 testimony relating to a land deal, which the government claimed was false on its own terms.

Before trial, Kennedy moved to suppress the statements he made prior to and during the grand jury hearing. He argued that they were obtained in violation of his Fifth and Sixth Amendments rights, and that Mott had engaged in prosecutorial misconduct. On September 26, 2002, the district court denied Kennedy's motion. It held that although Mott had wrongly advised Kennedy that he had no right to remain silent about subjects relating to his drug conviction, this violation did not require suppression of Kennedy's statements at the perjury trial. The court also rejected Kennedy's claims that his right to counsel was violated during the grand jury proceeding, or that Mott had committed prosecutorial misconduct.

At trial, the jury was presented with transcripts of Kennedy's grand jury testimony on February 19 and March 19, 2002, as well as testimonial evidence from Detective Merricks and Special Agent Blakey, among others. On October 1, 2002, the jury convicted Kennedy of four counts of perjury, and the district court later sentenced him to 30 months' imprisonment.

II.

Kennedy's primary contention on appeal is that his perjurious testimony should have been suppressed because it was obtained in violation of his Fifth Amendment right against self-incrimination and his Sixth Amendment right to counsel. Alternatively, Kennedy argues that these violations constituted prosecutorial misconduct amounting to a denial of due process. We address Kennedy's arguments in turn.

Kennedy first asserts infringements of his Fifth and Sixth Amendment rights. Kennedy argues that while his drug conviction was pending appeal, he retained his privilege against self-incrimination and his right to counsel as to those events forming the basis of his conviction. Since he was both interrogated by detectives and questioned before the grand jury about his drug conviction in the absence of counsel, he asserts that the resulting statements should be inadmissible for any purpose.

As an initial matter, we note that the United States has not attempted to use any of Kennedy's statements from the pre-grand jury interviews. Nor could the United States have used these statements in Kennedy's trial for perjury, since Kennedy was not under oath during the interviews. Consequently, the violations alleged to have occurred during these pre-grand jury interviews are irrelevant to Kennedy's claims that the grand jury transcripts should be suppressed under the Fifth and Sixth Amendments. We therefore focus here only upon the alleged constitutional breaches during the grand jury appearances.[2]

### A.

First, we agree with Kennedy that the government violated his Fifth Amendment right against self-incrimination during the grand jury proceeding. We have held in no uncertain terms that a defendant's right to invoke the Fifth Amendment as to events for which he has been convicted extends to the period during which the conviction is pending appeal. *See Taylor v. Best*, 746 F.2d 220, 222 (4th Cir. 1984); *accord United States v. Duchi*, 944 F.2d 391, 394 (8th Cir. 1991); *Frank v. United States*, 347 F.2d 486, 491 (D.C. Cir. 1965). Because any post-conviction evidence could be used against a defendant if his conviction were to be overturned, the risk of coerced self-incrimination remains until the conviction has been affirmed on appeal. *See Taylor*, 746 F.2d at 222. By misadvising Kennedy that he had no right to refuse to answer questions relating to his drug conviction before the grand jury, Mott thus violated Kennedy's Fifth Amendment rights.

---

[2]The asserted violations of Kennedy's constitutional rights during the pre-grand jury interviews are relevant, however, for his due process claim based on prosecutorial misconduct. *See infra* pp. 13-16.

Kennedy also alleges violations of his Sixth Amendment right to counsel. The Sixth Amendment prohibits the government from deliberately eliciting incriminating evidence from an accused "after he ha[s] been indicted and in the absence of his counsel." *Massiah v. United States*, 377 U.S. 201, 206 (1964). This right to counsel attaches upon the "initiation of adversary judicial criminal proceedings — whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby v. Illinois*, 406 U.S. 682, 689 (1972). And the right to appointed counsel "extends to the first appeal of right." *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987). However, the right to counsel is offense specific. *See McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991). Thus, "incriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached, are, of course, admissible at a trial of those offenses." *Maine v. Moulton*, 474 U.S. 159, 180 n.16 (1985).

It is clear, as the district court found, that Kennedy had no right to counsel for his perjury charges at the time he committed perjury, since no formal proceedings had been initiated against him for those charges. But it is equally clear that Kennedy had invoked his right to counsel for his drug conviction at the time he testified before the grand jury. Because Mott questioned Kennedy about the substance of his drug conviction in the grand jury hearing, outside the presence of counsel, it is at least arguable that he breached Kennedy's Sixth Amendment right to counsel. *See, e.g.*, *Brewer v. Williams*, 430 U.S. 387, 401 (1977) ("[O]nce adversary proceedings have commenced against an individual, he has a right to legal representation when the government interrogates him.").

However, it is relevant that Kennedy was questioned before a grand jury. The Supreme Court has stated that a grand jury witness "cannot insist, as a matter of constitutional right, on being represented by his counsel," even where the witness is a target of the investigation. *In re Groban*, 352 U.S. 330, 333 (1957); *see also United States v. Williams*, 504 U.S. 36, 49 (1992). Indeed, some courts have held that a grand jury witness who has an appeal pending from a prior criminal conviction has no absolute Sixth Amendment right to have counsel present inside the grand jury room. *See In re Grand Jury Subpoena* (*United States v. McDougal*), 97 F.3d 1090, 1093 (8th Cir. 1996); *United States v. Schwimmer*, 882 F.2d 22, 27 (2d Cir. 1989).

According to these courts, it is sufficient that a witness is allowed to have an attorney present outside the grand jury room and to consult with the attorney before answering any question. *See McDougal*, 97 F.3d at 1092-93; *Schwimmer*, 882 F.2d at 27. Here, Mott abided by this procedure and advised Kennedy that he could consult with his attorney outside the room before answering any question. And when Kennedy invoked his right to speak with counsel during the hearing, Mott appropriately respected it by stopping his line of questioning and ultimately continuing Kennedy's appearance for a month.

The parties have pointed us to no case from either the Supreme Court or this circuit deciding the exact dimensions of a defendant's right to counsel (once attached) when appearing before a grand jury. We need not define precisely the nature or extent of Kennedy's right to counsel here, however. It is clear that Kennedy's Fifth Amendment rights were violated. We are willing to assume, purely for purposes of argument, that his Sixth Amendment right to counsel was also violated during the grand jury hearing, either by Mott's alleged failure to notify Kennedy's counsel of the proceedings or by the simple fact that Kennedy was subject to questioning about his drug conviction pending appeal outside the presence of his counsel. *See Massiah*, 377 U.S. at 206.

## B.

The principal question we must answer, then, is whether these asserted violations of Kennedy's Fifth and Sixth Amendment rights require exclusion of his false statements before the grand jury. That Kennedy's rights were violated does not necessarily mean that his remedy includes suppression of these statements from his perjury trial. The distinction between rights and remedies, a classic feature of our legal system, is particularly important in the context of the procedural rights afforded to criminal defendants. The sweep of exclusionary rules is far from absolute, as courts have found illegally obtained evidence to be admissible for some purposes. *See United States v. Calandra*, 414 U.S. 338, 348 (1974) ("As with any remedial device, the application of the [exclusionary] rule has been restricted to those areas where its remedial objectives are thought most efficaciously served."). Therefore, though Kennedy's rights were violated, we still must determine the nature of the remedy to which he is entitled, and

specifically whether it includes prohibiting the government from using his testimony for the purpose of establishing perjury.

We would not hesitate to find that Kennedy's statements would be inadmissible at any subsequent proceeding relating to his drug conviction. Mott and the detectives legitimately sought to investigate drug and money laundering activities in Danville, and they reasonably believed that Kennedy possessed information that was relevant to this investigation. But they were not entitled to ignore Kennedy's constitutional rights in the process. *See Maine v. Moulton*, 474 U.S. 159, 179-80 (1985).

If it is plain that Kennedy's statements would be inadmissible in proceedings relating to his drug conviction, we are not prepared to accept Kennedy's more adventurous claim that his false statements should be excluded from his prosecution for perjury. It is well established that a defendant cannot immunize acts of perjury through suppression of false statements that were taken in violation of the defendant's constitutional rights. *See United States v. Mandujano*, 425 U.S. 564, 576-78, 582-84 (1976) (plurality opinion); *United States v. Wong*, 431 U.S. 174, 178-79 (1977). In *Mandujano*, a grand jury witness claimed that his false statements before a grand jury should have been suppressed from his perjury trial because he was never read his full *Miranda* rights. *See* 425 U.S. at 569. Although the Court was divided as to the exact nature of Mandujano's constitutional rights before the grand jury, the Court was unanimous that violation of those rights — whatever their nature — would not require exclusion of his false statements at his perjury trial. *See id.* at 576-77, 582-84 (plurality opinion); *id.* at 584-85, 607-08 (Brennan, J., concurring); *id.* at 609 (Stewart, J., concurring). Chief Justice Burger declared for a plurality that "perjured testimony is an obvious and flagrant affront to the basic concepts of judicial proceedings." *Id.* at 576. As such, he observed that the Court's cases "have consistently — indeed without exception — allowed sanctions for false statements or perjury," even "where the perjurer complained that the Government exceeded its constitutional powers in making the inquiry." *Id.* at 577.

Just one year later, in *United States v. Wong*, the Court reaffirmed this signal principle. There, Wong was being prosecuted for perjury based on her testimony before a grand jury, and she claimed that her

allegedly false statements should have been suppressed because she effectively had not been warned of her Fifth Amendment privilege. *See* 431 U.S. at 175-77. The Court, invoking the rule that "the Fifth Amendment privilege does not condone perjury," held that the statements were admissible at her perjury trial. *Id.* at 178-79. The Court explained that although defendants may find themselves in situations where they must choose between incriminating themselves with the truth or lying, perjury is simply not an option. *See id.* at 178-80. "If the citizen answers the question, the answer must be truthful." *Id.* at 180.

The Supreme Court has in a variety of contexts upheld this principle, applied in *Mandujano* and *Wong*, that a defendant may not have his act of perjury excused, through suppression of evidence, because of constitutional violations. *See, e.g., Harris v. New York*, 401 U.S. 222, 225 (1971) ("Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury."); *Bryson v. United States*, 396 U.S. 64, 72 (1969) ("[I]t cannot be thought that as a general principle of our law a citizen has a privilege to answer fraudulently a question that the Government should not have asked. Our legal system provides methods for challenging the Government's right to ask questions — lying is not one of them.").

No less unwavering has been this circuit's commitment to the general principle that perjury is an unacceptable response to asserted constitutional violations. For example, we stated that a defendant accused of committing perjury, though he could have invoked his Fifth Amendment privilege, "had no right to provide false testimony under oath. It is a stalwart principle of American jurisprudence that testifying witnesses have two permissible choices. They can provide truthful testimony or they can invoke the protections of the Fifth Amendment. False testimony is not a permissible option." *United States v. Sarihifard*, 155 F.3d 301, 308 (4th Cir. 1998) (citation omitted); *see also United States v. Shuck*, 895 F.2d 962, 965 (4th Cir. 1990) ("[The defendant's] insistence that the prosecutor improperly questioned him affords no justification for his falsehoods.").

Other circuits have invoked this principle specifically to deny motions to suppress statements from a perjury prosecution that were

obtained in violation of a defendant's constitutional rights. *See, e.g.*, *United States v. Bova*, 350 F.3d 224, 227-28 (1st Cir. 2003) (denying a motion to suppress testimony from a perjury prosecution over a Sixth Amendment right to counsel objection, asserting that "defects in the steps that may bring witnesses to the stand are not adequate reason for tolerating the lies and foregoing punishment"); *United States v. Olmeda*, 839 F.2d 1433, 1434-37 (11th Cir. 1988) (denying a motion to suppress grand jury testimony from a perjury prosecution because, even assuming that the witness's right to have counsel present was violated before the grand jury, "the failure of the government to provide an attorney for her does not excuse perjury on her part"); *United States v. Babb*, 807 F.2d 272, 277 (1st Cir. 1986) (denying a motion to suppress grand jury testimony from a perjury trial over a Fifth Amendment challenge, stating that "the commission of perjury does not fall within the protection afforded compelled self-incriminating statements").

It is true, as Kennedy argues, that the actual holdings in *Mandujano* and *Wong* were limited to the Fifth Amendment. We see no reason to treat violations of the Sixth Amendment right to counsel any differently in this context, however. Lying under oath is no more of an acceptable response to a violation of one's right to counsel than it is to a breach of one's right to remain silent. In both instances, the defendant's remedy does not include the ability to immunize his false testimony from a prosecution for perjury. This is especially true because, as it has in the Fifth Amendment context, the Court has narrowed the remedial scope of asserted Sixth Amendment violations. *See McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991) (holding that the right to counsel is offense specific); *Moulton*, 474 U.S. at 180 n.16 (holding that "incriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached, are, of course, admissible at a trial of those offenses"). The use of a defendant's false statements in a trial for the *separate* offense of perjury is consistent with the offense-specific nature of the Sixth Amendment.

Indeed, although the Court has not expressly applied the principle of *Mandujano* and *Wong* to an asserted Sixth Amendment violation, Justice Brennan stated in his concurrence in *Mandujano* that it was unnecessary "to define the exact dimensions of [Mandujano's] right to counsel since the testimony obtained by the grand jury interroga-

tion was not introduced as evidence at [Mandujano's] trial on the charge concerning which he was questioned." 425 U.S. at 607-08. Thus, he suggested that statements obtained in violation of the Sixth Amendment could be used to establish perjury, just as he concluded in the case of the Fifth Amendment. Moreover, the First Circuit has recently applied the principle of *Mandujano* and *Wong* to reject a suppression motion based on an asserted Sixth Amendment violation. *See Bova*, 350 F.3d at 227-28.

In view of this authority, we conclude that Kennedy's false statements are admissible to prove that he committed perjury, even if they were obtained in violation of the Fifth and Sixth Amendments. There is no question that Kennedy was entitled to protest the infringement of his rights. His remedy, however, was not to perjure himself and expect immunity from prosecution. The act of perjury strikes at the core of our system of justice: it pollutes the judicial process, and it breeds disrespect for the sanctity of the oath and the imposition of punishment. *See Mandujano*, 425 U.S. at 576-78. It is simply incompatible with the values underlying our criminal justice system that a defendant can lie under oath in order to remedy perceived abuses of his rights.

### III.

Kennedy alternatively claims that the breaches of his Fifth and Sixth Amendment rights constituted a violation of due process. The Supreme Court recognized in *Mandujano* and *Wong* that a perjury conviction should be overturned where the false statements were induced by prosecutorial misconduct so unfair as to amount to a denial of due process. *See Mandujano*, 425 U.S. at 583 (plurality opinion); *id.* at 585 (Brennan, J., concurring); *id.* at 609 (Stewart, J., concurring); *Wong*, 431 U.S. at 179-80; *see also United States v. Shuck*, 895 F.2d 962, 966 (4th Cir. 1990).

The basis for Kennedy's due process claim is his assertion that Mott and the detectives committed prosecutorial misconduct. In order to establish prosecutorial misconduct, Kennedy must demonstrate that Mott's conduct was improper, and that this misconduct prejudicially affected his substantial rights. *See United States v. Derrick*, 163 F.3d 799, 807-08 (4th Cir. 1998). We review the district court's factual

findings for clear error and its legal conclusions de novo. *See United States v. Ellis*, 121 F.3d 908, 927 (4th Cir. 1997).

There can be little question that Mott's conduct was improper. As we have held, Mott violated Kennedy's Fifth Amendment privilege by instructing him that he could not refuse to testify about a drug conviction that was on direct appeal. Moreover, while we have assumed for purposes of argument that Mott violated Kennedy's Sixth Amendment rights in the grand jury proceeding, it is clear that his right to counsel in the pre-grand jury interview was breached by questions about his drug conviction outside the presence of his attorney. *See Massiah v. United States*, 377 U.S. 201, 206 (1964).

In Kennedy's view, these breaches severely prejudiced him. To support this claim, Kennedy points to *United States v. Doss*, 563 F.2d 265, 278-79 (6th Cir. 1977), in which the Sixth Circuit suppressed a defendant's grand jury testimony because it was found to be the result of prosecutorial misconduct amounting to a denial of due process. Like the defendant in *Doss*, Kennedy asserts, he would not have testified before the grand jury but for the violations of his rights, and therefore he would not have perjured himself. Thus, Kennedy argues that his false statements should be suppressed.

We disagree. First, *Doss* is distinguishable from the present case. In *Doss*, the grand jury witness had already been indicted for a substantive offense by the grand jury in front of which he was testifying, but the prosecution concealed that fact from him. *See* 563 F.2d at 267. The prosecutor then proceeded to question the witness about the substance of his offense. *See id.* at 271. The Sixth Circuit found that "the government deliberately and purposefully employed the grand jury in questioning an already indicted defendant about the crime for which he was soon to be tried." *Id.* The *Doss* court's holding rested upon its view that the prosecutor abused the grand jury process by using it as a mere discovery tool for obtaining evidence against the defendant. *See id.* at 276-77.

Here, by contrast, there is no evidence that Mott questioned Kennedy simply to further the government's prosecution of Kennedy. The government reasonably believed that Kennedy had information that would be helpful to the grand jury's investigation of other individuals

and crimes. *See Shuck*, 895 F.2d at 966. And Kennedy was not even a target of the investigation. Thus, *Doss* provides no help to Kennedy's due process claim. *See United States v. Schwimmer*, 882 F.2d 22, 26 (2d Cir. 1989) ("Unlike *Doss*, we cannot conclude that the government's actions were taken for the impermissible purpose of gathering evidence against the appellant-witness.").

Notably, in rejecting Kennedy's claim, the district court found that "there is no indication of trickery or deception on the part of the government." It observed that although Mott failed to abide by all of Kennedy's constitutional rights, he properly advised Kennedy about his right to speak with counsel outside of the grand jury room. And Mott appropriately respected Kennedy's invocation of counsel by passing over questions and ultimately by continuing Kennedy's appearance. The district court therefore concluded that Kennedy could not establish prosecutorial misconduct — a finding that the dissent neglects even to mention.

Two additional factors are important here. First, Mott repeatedly warned Kennedy that he was under oath and that lying would constitute perjury. Mott even gave Kennedy the opportunity to correct his testimony at the end of his March 19 appearance. It is abundantly clear in light of all these warnings that Mott was not trying to trick Kennedy into perjuring himself. *See Shuck*, 895 F.2d at 966. Second, the fact that Kennedy consulted his attorney before his second grand jury appearance — and prior to perjuring himself — further undercuts his claim. Inherent in Kennedy's due process argument is the notion that the Fifth and Sixth Amendment violations were so pervasive that they led him to perjure himself. This alleged "but-for causation," however, is difficult to maintain in light of the fact that Kennedy consulted with his attorney prior to perjuring himself. *See id.* at 966-67.

In view of these facts, we agree with the district court's finding that there was no prejudicial prosecutorial misconduct. In *Shuck*, we held that no such misconduct was present where the prosecutor responded to a defendant's invocation of his Fifth Amendment privilege in a grand jury proceeding by badgering the witness with repeated questions about the subject matter for which the privilege was invoked. *See* 895 F.2d at 966-67. The present case is less difficult to decide, because Mott and the detectives, despite their incorrect assessments

of Kennedy's rights, never badgered Kennedy or coerced him into testifying. Suppression of false statements from a perjury trial under a due process rationale — an exception to the general principle established in *Mandujano* and *Wong* — should be a rare occurrence. Otherwise, we risk subverting the sensible limiting principle to the exclusionary rule by treating all violations of the Fifth and Sixth Amendments as violations of due process. *See United States v. Bova*, 350 F.3d 224, 229 (1st Cir. 2003) ("Perhaps in some extreme situation a prosecutor's interference with the right to counsel might seem so egregious and functionally related to the perjury as to provide an arguable case for . . . a sanction [of exclusion]. . . . The naked perjury in this case provides no encouragement to plough new ground."). In short, Kennedy's due process claim must fail.

## IV.

Kennedy next argues that there was insufficient evidence for the jury to find that his statements were material to the grand jury's investigation. Although Kennedy's drug distribution was not the focus of the grand jury's investigation, the fact that his statements bore on the drug activities of three potential targets — and affected the grand jury's revelation of other parties involved in drug dealing in Danville — made them material. His statements, in short, had the potential to "impede the grand jury's capacity to attain an accurate and prompt resolution of the matter under consideration." *United States v. Sarihifard*, 155 F.3d 301, 307 (4th Cir. 1998). We accordingly reject Kennedy's claim that there was insufficient evidence to establish materiality.

## V.

Kennedy's final contention is that the district court erred in failing to give a requested jury instruction on the defense of perjury entrapment. We review a district court's decision whether to give a jury instruction for abuse of discretion. *See United States v. Russell*, 971 F.2d 1098, 1107 (4th Cir. 1992).

Kennedy attempted to assert a perjury entrapment defense, and he requested a jury instruction to that effect. The defense of entrapment applies where the government induces a person to commit a crime

and that person had no predisposition to engage in the criminal act. *See Mathews v. United States*, 485 U.S. 58, 62-63 (1988). To establish inducement, a defendant must show that the "government acted in an excessive manner that would prompt a reasonably firm person to commit a crime." *Sarihifand*, 155 F.3d at 308. In the context of a perjury charge, "entrapment occurs when a government agent coaxes a defendant to testify under oath for the sole purpose of eliciting perjury." *Id.*

The district court rejected Kennedy's request for a jury instruction on perjury entrapment. It found that Mott had a legitimate purpose in bringing Kennedy before the grand jury. It also noted that Mott made every effort in the March 19 proceeding to get Kennedy to tell the truth and that he repeatedly warned Kennedy throughout both appearances of the consequences of perjury. Accordingly, the district court concluded that there was no "evidence from [Kennedy] on which to predicate an entrapment instruction." We find no reason to disturb this ruling.

## VI.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.

MICHAEL, Circuit Judge, dissenting:

Robert Kennedy, Jr.'s drug trafficking conviction was on appeal when an Assistant United States Attorney (AUSA) forced him to testify before a grand jury about what he had done. Though it seems incredible, the AUSA actually told Kennedy that he did not have a Fifth Amendment right to refuse to testify in the grand jury about his pending case. The AUSA then questioned Kennedy, who was still an accused, in blatant violation of his Sixth Amendment right to counsel. In all of this, the AUSA misused the grand jury because it had no authority to interrogate Kennedy about his crimes while his case was still pending. After Kennedy testified falsely in his second forced grand jury appearance, he was prosecuted and convicted for perjury. In the events leading up to the perjury prosecution, the AUSA flouted

Kennedy's rights and abused the grand jury power to such a degree that Kennedy was denied due process. I therefore respectfully dissent from the majority's refusal to order the suppression of Kennedy's grand jury testimony.

I.

The facts relating to the many violations of Kennedy's constitutional rights are worth repeating. Kennedy, who is now fifty-eight years old, was subpoenaed to give post-conviction testimony before the grand jury in February and March 2002; he had just been sentenced to thirty-five years in prison on two counts of distributing crack cocaine in violation of 21 U.S.C. § 841(a)(1) and one count of conspiracy to distribute more than five kilograms of cocaine and more than fifty grams of crack in violation of 21 U.S.C. § 846. Kennedy was being held in the Roanoke, Virginia, city jail, awaiting transfer to federal prison. His appeal was pending, and he was represented by counsel. Meanwhile, the investigation into the drug ring that Kennedy had been a part of was continuing, and the government was interested in learning more about the activities of his confederates. The AUSA, who was in charge of the ongoing investigation and who had prosecuted Kennedy on the drug charges, knew that Kennedy's conviction was on direct appeal and that he was represented by counsel.

Despite this knowledge the AUSA twice brought Kennedy from the Roanoke city jail to the federal building to be interrogated and to testify before the grand jury about the very same conduct that led to his conviction and pending appeal. Kennedy's lawyer was not there to assist him on either occasion. Right before each of Kennedy's grand jury appearances, drug task force officers — at the direction of the AUSA — interrogated Kennedy in the U.S. Marshal's office about his offense conduct. Kennedy was not informed of his *Miranda* rights on either occasion. Again, his lawyer was not present, even though the officers also knew he was represented. Each pre-grand jury interrogation session began with the AUSA giving Kennedy wrong or misleading information about his constitutional rights. First, the AUSA instructed Kennedy that he did not have a Fifth Amendment right to refuse to testify about the conduct underlying his convictions that were on appeal. As the majority recognizes, this advice was completely wrong and violated Kennedy's Fifth Amendment

right against self-incrimination. *See ante* at 7. Second, the AUSA gave Kennedy advice that was misleading and deceptive in the circumstances: the AUSA told Kennedy that he had a right to consult with his lawyer outside the grand jury room. This advice would have been correct only if Kennedy's appeal had been concluded and his conviction affirmed. Because Kennedy's conviction was not yet final, the AUSA should have told him that he had the right not to be put before the grand jury to testify about his pending case unless he first waived his right to counsel. During the interrogation sessions that preceded both of his grand jury appearances, Kennedy made it plain to the officers that he did not want to talk. He said repeatedly that he did "not want[ ] to testify before the grand jury" and that "he would just pull his 35 years." J.A. 21, 23. Nevertheless, in the first interview the officers were able to get quite a bit of information from Kennedy about his drug dealing. Although the AUSA did not remain in the room during the pre-grand jury interrogations, he knew that the officers would be questioning Kennedy about his offense conduct. And the AUSA had access to the information gathered by the officers to guide his questions of Kennedy in the grand jury.

At the start of each of Kennedy's grand jury appearances, the AUSA gave Kennedy the same erroneous and misleading advice he was given prior to the sessions in the Marshal's office. Kennedy was told that he did not have the right to refuse to answer questions about the offenses for which he had been convicted and that he only had a right to consult his lawyer outside the grand jury room. The AUSA then asked, and Kennedy answered, many questions about what he had done to be convicted. The AUSA suspended the questioning in Kennedy's first appearance after Kennedy asked *a second time* to speak to his lawyer. The AUSA said he would "make arrangements" for Kennedy's lawyer to be there for his next grand jury appearance. J.A. 314. No such arrangements were ever made, however. Kennedy did talk with his lawyer after his first appearance, but the record reveals nothing about the substance of that conversation.

At his first grand jury appearance, Kennedy testified about the cocaine transactions that led to his pending conviction, and he named persons to whom he had sold drugs. When Kennedy was asked about these transactions at his second grand jury appearance, he claimed that he could not remember anything. This led to Kennedy's indict-

ment on five counts of perjury (one count was dismissed). The district court denied Kennedy's motion, made on Fifth and Sixth Amendment grounds, to suppress his grand jury testimony. Kennedy was then convicted of perjury and sentenced to an additional thirty months imprisonment, to be served consecutively to his existing 420-month (thirty-five year) sentence on the drug charges. Kennedy's perjury conviction is bottomed on nearly a dozen separate violations of his Fifth and Sixth Amendment rights that occurred during the pre-grand jury and grand jury interrogations. Specifically, Kennedy's Sixth Amendment right to counsel was violated each of the four times (two grand jury appearances and two pre-appearance sessions) he was questioned outside the presence of his counsel about the conduct underlying his convictions. His Fifth Amendment right to be free of compelled self-incrimination was violated each of the four times the AUSA incorrectly informed him that he had no right to refuse to testify about his convictions. Kennedy's Fifth Amendment rights were also violated when he was not given *Miranda* warnings before each of his pre-grand jury interrogation sessions. Finally, when the AUSA's oppressive acts, including his abuse of the grand jury process, are all put together, they violate Kennedy's right to due process under the Fifth Amendment.

II.

A.

I will first discuss the significance of the Sixth Amendment violations, which the majority fails to recognize fully. If Kennedy's Sixth Amendment rights had been honored, he would not have been brought before the grand jury in the first place. "The Sixth Amendment guarantees the accused . . . the right to rely on counsel as a 'medium' between him and the [government]." *Maine v. Moulton*, 474 U.S. 159, 176 (1985). The right to counsel attaches at the beginning of a criminal prosecution and continues through the first appeal as of right. *Massiah v. United States*, 377 U.S. 201, 206 (1964); *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987); *see also Taylor v. Best*, 746 F.2d 220, 222 (4th Cir. 1984). An indictment, for example, triggers the right to counsel, *Michigan v. Jackson*, 475 U.S. 625, 632 (1986), and thereafter the defendant must have "legal representation when the government interrogates him," *Brewer v. Williams*, 430 U.S.

387, 401 (1977). Because the right to legal representation after indictment is so basic, the government has an "affirmative obligation" not to interrogate the accused unless his lawyer is present. *Moulton*, 474 U.S. at 176; *see also Jackson*, 475 U.S. at 631-32. The government's violation of this obligation "contravenes the basic dictates of fairness in the conduct of criminal causes and the fundamental rights of persons charged with crime." *Massiah*, 377 U.S. at 205 (internal quotation marks and citation omitted). The Sixth Amendment right to counsel has certain limits. For instance, the right may be waived, *Brewer*, 430 U.S. at 404, and it only attaches to the offense charged, *Texas v. Cobb*, 532 U.S. 162, 167-68 (2001). None of the limitations applies here, however.

Kennedy's Sixth Amendment right to counsel was violated a number of times, by the officers in the interrogation sessions and by the AUSA before the grand jury. Because Kennedy had been formally charged with the very drug offenses he was being questioned about, and his conviction for those offenses was on appeal, Kennedy remained an accused. *See Massiah*, 377 U.S. at 206; *Taylor*, 746 F.2d at 222 (holding that a defendant with an appeal pending retains his Fifth Amendment privilege because compelled statements might be used against him in subsequent proceedings). The AUSA and the officers, therefore, could not question Kennedy about those offenses without his lawyer present, unless he waived his Sixth Amendment right. *See Brewer*, 430 U.S. at 401, 404. Moreover, because Kennedy's lawyer could not have accompanied Kennedy inside the grand jury room, *see* Fed. R. Crim. P. 6(d), the AUSA had an affirmative obligation not to bring Kennedy before the grand jury at all for questioning about his unaffirmed convictions. *See Moulton*, 474 U.S. at 171. Instead of respecting Kennedy's Sixth Amendment rights, the AUSA "knowingly circumvent[ed] [Kennedy's] right to the assistance of counsel." *Id.* at 180. The offense specific nature of the right to counsel does not negate Kennedy's right because he was questioned about the offenses involved in his pending drug case; he was not questioned about any perjury offense. *See Cobb*, 532 U.S. at 167. In sum, Kennedy's Sixth Amendment right was violated every time the officers or the AUSA questioned him, either in the pre-grand jury sessions or before the grand jury itself.

The majority is wrong to suggest that it might have been permissible for the government to bring Kennedy before the grand jury in

these circumstances because the AUSA told him he could consult with his lawyer outside the grand jury room. *Ante* at 8. The cases cited by the majority for this proposition are short of the mark because they deal with *unindicted targets* of grand jury investigations, who are not yet accused within the meaning of the Sixth Amendment. *Compare Massiah*, 377 U.S. at 206, *with United States v. Williams*, 504 U.S. 36, 49 (1992), and *In re Groban*, 352 U.S. 330, 333 (1957). Kennedy, as an *accused*, had the Sixth Amendment right not to be brought before the grand jury to testify about his offenses of conviction that were pending on appeal. *See Moulton*, 474 U.S. at 176. Simply put, the government could not confront Kennedy in any situation where his lawyer was not or could not be present. *Id.* Justice Brennan made this same point, relying on the Fifth Amendment, in his opinion concurring in the judgment in *United States v. Mandujano*, 425 U.S. 564, 594 (1976): "[i]t is clear that the government may not in the absence of an intentional and knowing waiver call an indicted defendant before a grand jury and there interrogate him concerning the subject matter of a crime for which he already stands formally charged."

The cases from other circuits cited by the majority are easily distinguishable from Kennedy's situation. *See ante* at 8. Both *In re Grand Jury Subpoena* (*United States v. McDougal*), 97 F.3d 1090, 1092-93 (8th Cir. 1996), and *United States v. Schwimmer*, 882 F.2d 22, 27 (2d Cir. 1989), relied on the government's grant of use immunity to hold that an indicted grand jury witness could be questioned outside the presence of counsel without violating the Constitution. Here, Kennedy was not granted use immunity, nor did he waive his Sixth Amendment right to counsel. He therefore had a constitutional right to have his lawyer sitting next to him any time the government questioned him about the offenses he was being prosecuted for, even if the government's purpose was to seek information about others involved in his drug dealing. *See Moulton*, 474 U.S. at 179-80. The AUSA's misleading advice to Kennedy — that he had the right to consult his (absent) lawyer outside the grand jury room — does not excuse the blatant Sixth Amendment violations. *See id.* at 176.

The majority, in arguing that any Sixth Amendment violations here are not a bar to Kennedy's perjury prosecution, relies on *Mandujano*, 425 U.S. 564, and *United States v. Wong*, 431 U.S. 174 (1977), cases where grand jury testimony obtained in violation of the Fifth Amend-

ment was used to establish perjury. *Ante* at 10. In relying on these Fifth Amendment cases, the majority ignores important differences between the Fifth Amendment privilege against self-incrimination and the Sixth Amendment right to counsel. As long as the government honors Fifth Amendment safeguards (such as giving *Miranda* warnings when required), it may ask questions of an individual that could lead to incriminating answers; it is up to the individual to assert his Fifth Amendment privilege. *E.g.*, *Minnesota v. Murphy*, 465 U.S. 420, 427-28 (1984). This procedure "reflect[s] an appropriate accommodation of the Fifth Amendment privilege and the generally applicable principle that governments have the right to everyone's testimony." *Garner v. United States*, 424 U.S. 648, 655 (1976). In contrast, the Sixth Amendment *forbids* the government from questioning an accused about charged offenses outside the presence of his lawyer. *Moulton*, 474 U.S. at 176. Moreover, once the Sixth Amendment right to counsel has attached, the accused does not have to assert his right every time the government seeks to question him. *Brewer*, 430 U.S. at 404. The government has an affirmative obligation to refrain from questioning an accused without his lawyer present, and that obligation is fundamental to "our whole system of adversary criminal justice." *Kirby v. Illinois*, 406 U.S. 682, 689 (1972). These differences between the Fifth and Sixth Amendments mean that the grand juries in *Mandujano* and *Wong*, where the witnesses were not yet accused or indicted, could ask the questions that led to perjurous answers that were not suppressed. An indicted individual, however, cannot be brought into the grand jury to testify about his charged conduct, for that violates his right to have counsel at his side. *See Moulton*, 474 U.S. at 176. In this case, therefore, where criminal proceedings were still pending against Kennedy, the grand jury was constitutionally forbidden from asking the questions that led to his false answers. *See Mandujano*, 425 U.S. at 581; *Wong*, 431 U.S. at 179-80; *Brown v. United States*, 245 F.2d 549, 554-55 (8th Cir. 1957) (reversing a perjury conviction because the grand jury was investigating crimes in another jurisdiction and the purpose of the questioning was to lay a foundation for a perjury indictment).

In sum, the grand jury in this case was never entitled to Kennedy's testimony, truthful or otherwise, because the grand jury (through the AUSA) violated Kennedy's Sixth Amendment right to have his lawyer present at all interrogations from indictment through appeal. It is

not necessary to decide, however, whether the Sixth Amendment violations alone require the suppression of Kennedy's grand jury testimony at his perjury trial. As I explain next, the testimony must be suppressed because Kennedy's rights were trampled to the point that he was denied due process.

B.

The AUSA's abusive tactics and procedures violated Kennedy's Fifth Amendment due process rights. After misusing the government's subpoena power to bring Kennedy to the courthouse while his appeal was pending, the AUSA proceeded to commit or orchestrate Fifth and Sixth Amendment violations in the process of requiring Kennedy to answer questions about his offenses. What is more, the AUSA misused the grand jury, which had no authority to question Kennedy about his case while it was still on appeal. These overbearing tactics were pervasive and shocking, and they must be recognized for what they amount to — a violation of the Due Process Clause of the Fifth Amendment.

Kennedy was not given the required *Miranda* warnings at either of the pre-grand jury interrogations. Yet at both sessions, Kennedy made it clear that he did not want to testify about or discuss his offenses; he said repeatedly that he "just wanted to do his time." J.A. 24. Even though Kennedy made his wishes plain in laymen's language, the AUSA put him into the grand jury and misadvised him that he did not have a Fifth Amendment right to refuse to testify about the conduct that led to his convictions then pending on appeal. The AUSA then proceeded to ask him questions about that very conduct, compounding the Fifth Amendment violations. No perjury case cited by the majority involves Fifth Amendment violations by a prosecutor that approach this level of abuse. For example, in *Mandujano* the Supreme Court held that a grand jury witness, who was a suspect, could be prosecuted for perjury even though he was not given *full Miranda* warnings. 425 U.S. at 578-79. Likewise, in *Wong* the untruthful grand jury witness, who was under investigation, was subject to a perjury prosecution even though she did not — because of language barriers — understand the prosecutor's warning that she had a Fifth Amendment right not to answer incriminating questions. 431 U.S. at 177. Here, in contrast, the AUSA told Kennedy that he *did not have* a Fifth

Amendment right to refuse to testify. That was dead wrong and inde-fensible. The AUSA simply rode roughshod over Kennedy, forcing him to testify against himself.

Kennedy's case is also different from *Mandujano* and *Wong* because the grand juries in those cases were exercising their lawful investigative authority to gather evidence from witnesses who were suspected of criminal activity. *See Mandujano*, 425 U.S. at 573, 578; *Wong*, 431 U.S. at 179-80. Here, the grand jury's role in Kennedy's pending case terminated when he was indicted. After his indictment the grand jury had no authority to call Kennedy before it to testify about his pending case. The AUSA, by putting Kennedy before the grand jury to question him about his ongoing case, forced the grand jury to act beyond its authority. This amounted to an abuse of process in violation of the Fifth Amendment. *United States v. Doss*, 563 F.2d 265, 276-77 (6th Cir. 1977); *Brown*, 245 F.2d at 554-55; *see also Mandujano*, 425 U.S. at 583; *id.* at 594 (Brennan, J., concurring in the judgment).

The AUSA's conduct here was far different from that of the prose-cutors in *Mandujano* and *Wong* for still another reason: the AUSA repeatedly violated Kennedy's Sixth Amendment right to counsel. This debacle could have been prevented if the AUSA had honored Kennedy's Sixth Amendment right and allowed his lawyer to be pres-ent at the interrogations that preceded each grand jury appearance. If the lawyer had been there, he could have put force behind Kennedy's wishes and assisted him in asserting his Fifth Amendment rights before any interrogation began. In addition, the lawyer could have reminded the AUSA that a defendant whose case is on appeal must not be subjected to questioning before a grand jury about the offenses involved. By the time Kennedy's case had reached the post-trial stage, he had established a pattern of not talking to the authorities and of not testifying. He did not cooperate with the authorities before his trial, he did not testify at trial, and he said repeatedly in the post-trial inter-rogation sessions that he did not want to talk to the authorities or tes-tify in the grand jury. If his lawyer had been with him when he was confronted by the authorities after his conviction, it is likely that Ken-nedy's continuing wish to remain silent would have been honored. It is not enough to say that Kennedy talked with his lawyer about some-thing between his grand jury appearances, *see ante* at 15, because that

is no substitute for his constitutionally guaranteed right to have his counsel with him during every interrogation "as a 'medium' between him and the [authorities]." *Moulton*, 474 U.S. at 176. In short, this case is a perfect illustration of why the interrogation of a defendant without his lawyer while his case is still pending "contravenes the basic dictates of fairness in the conduct of criminal causes and the fundamental rights of persons charged with crime." *Massiah*, 377 U.S. at 205 (internal quotation marks and citation omitted).

The majority recognizes six violations of Kennedy's constitutional rights and assumes that two others occurred. Yet it concludes that there was no due process violation, in part because the AUSA says he was not aiming to gather evidence against Kennedy. *Ante* at 14-15. The AUSA asserts that he was investigating others involved in drug dealing; that, of course, was an appropriate prosecutorial mission. Nevertheless, as the majority recognizes elsewhere in its opinion, the AUSA and the officers "were not entitled to ignore Kennedy's constitutional rights in the process" of this investigation. *Ante* at 10 (citing *Moulton*, 474 U.S. at 179-80). The majority also relies on the facts that the AUSA did not trick Kennedy into lying, that he paid lip service to Kennedy's right to consult with his lawyer outside the grand jury room, that he warned Kennedy of the consequences of lying under oath, and that he gave Kennedy an opportunity to change his testimony. *Ante* at 15. Although the majority may be correct that the AUSA's constitutional violations did not force Kennedy to testify falsely, they did force him to testify in "contraven[tion of] the basic dictates of fairness in the conduct of criminal causes and [Kennedy's] fundamental rights." *Massiah*, 377 U.S. at 205 (internal quotation marks and citation omitted). The unfairness here was the very act of calling Kennedy to testify before the grand jury. *See Wong*, 431 U.S. at 179. In any event, the AUSA's repeated and wrong instructions about Kennedy's Fifth Amendment rights almost certainly led him to incriminate himself during his first grand jury appearance and to answer questions falsely when he should have remained silent during his second appearance.

Kennedy was still an accused with Fifth and Sixth Amendment rights when the AUSA twice arranged for his interrogation by officers and twice questioned him before the grand jury. The AUSA's actions — from arranging for Kennedy to be interrogated without counsel, to

telling him that he had no Fifth Amendment rights, to ignoring his express wishes that he not be questioned, to questioning him before grand jury in violation of his Sixth Amendment rights, to misusing the grand jury at a time when it had no authority over Kennedy's pending case — amount to shocking misconduct. This misconduct corrupted the investigative and grand jury process to a degree that it denied Kennedy his due process rights. *See Mandujano*, 425 U.S. at 583; *id.* at 585 (Brennan, J., concurring in the judgment).

## C.

This case presents a real dilemma. There is no solution that offers complete justice because both sides have engaged in reprehensible conduct. The AUSA repeatedly violated Kennedy's most basic rights as an accused in a criminal case, and that must be condemned. Kennedy committed perjury, and that must also be condemned. If we leave things as they are, Kennedy stands convicted of perjury, and the AUSA stands excused. That result, I believe, does not take sufficient account of the prosecutorial abuse.

The government had lawful ways to obtain Kennedy's testimony before his appeal was concluded. The AUSA could have contacted Kennedy's lawyer and requested that he waive his rights and testify voluntarily. If that failed, the government could have given Kennedy use immunity. Immunity was a reasonable option, especially since the government had no intention of pursuing Kennedy any further for drug crimes. Rather than taking a common sense approach, the AUSA plunged recklessly ahead, jerking Kennedy into interrogation sessions and grand jury proceedings and committing a slew of constitutional violations along the way.

During this entire interrogation and grand jury process, Kennedy did not know what his rights were. The AUSA used his dominant position to mislead Kennedy about his rights, and he forced Kennedy to testify against himself. The majority suggests that Kennedy's remedy is "to protest the infringement of his rights." *Ante* at 13. But protest is an inadequate remedy in this instance. Protest, for example, cannot undo the tangible detriment to Kennedy that stems from the AUSA's misconduct: a two and one-half year sentence for perjury

added to a thoroughly deserved thirty-five year sentence for drug dealing, all to be served by a man who is nearly sixty years old.

I believe that Kennedy's false testimony to the grand jury must be suppressed in light of the magnitude of the violations of his rights. I recognize, of course, that "[p]erjured testimony is an obvious and flagrant affront to the basic concepts of judicial proceedings," and perjury "has no place" in an ordered system of justice. *Mandujano*, 425 U.S. at 576. The rule that perjury cannot be excused is not quite absolute, however, because the Supreme Court has recognized that entrapment or abuse of the grand jury process may require the dismissal of perjury charges. *Mandujano*, 425 U.S. at 583. As one Justice who concurred in the *Mandujano* judgment explained: when false answers before a grand jury are "induced by governmental tactics or procedures so inherently unfair under all the circumstances . . . a prosecution for perjury [may constitute] a violation of the Due Process Clause of the Fifth Amendment." *Id.* at 585 (Brennan, J., concurring in the judgment). *See also id.* at 609 (Stewart, J., concurring in the judgment) (noting that a perjury prosecution may be barred when there is "prosecutorial conduct amounting to a denial of due process"). The prosecutor's tactics here, especially his misuse of the grand jury, were so abusive and unfair that Kennedy was denied due process. His perjured testimony should therefore be suppressed.