**STATE of Missouri, Plaintiff–Respondent,**

v.

**Deshun WASHINGTON, Defendant–Appellant.**

**No. ED 75176.**

Missouri Court of Appeals, Eastern District, Division Two.

Nov. 9, 1999.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 5, 2000.

Application for Transfer Denied Feb. 22, 2000.

David L. Simpson, Asst. Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Daniel W. Follett, Asst. Atty. Gen., Jefferson City, for respondent.

ROBERT G. DOWD, Jr., Judge.

Deshun Washington (Defendant) appeals from his judgment of conviction by a jury of murder in the first degree, Section 565.020, RSMo 1994. The trial court sentenced Defendant to life imprisonment without parole. Defendant contends the trial court erred in (1) admitting his statements made to a detective after transfer to the adult court because the questioning violated Defendant's Sixth Amendment right to counsel and (2) allowing demonstrative evidence of Defendant picking up a concrete block at trial. We affirm.

Viewed in the light most favorable to the verdict, the evidence adduced at trial was as follows: On the afternoon of October 9, 1996, the victim's neighbor was outside working in the yard when she noticed a maroon minivan drive by. About forty-five minutes later, that neighbor's husband discovered the body of an elderly man in a dry creek bed in north St. Louis County. One of the officers at the scene found an insurance card next to the body. The officer issued a "wanted" on the vehicle matching the identification number on the card and the description of the victim's minivan. A concrete block found near the body was also seized at the crime scene.

An officer noticed a maroon minivan matching the description. The officer pursued the minivan, which collided with another vehicle. The two individuals in the minivan got out and ran away on foot. Two males, Defendant and James Nelson, were apprehended by officers. Officers found a portable stereo, a thermal underwear shirt, a T-shirt, and latex gloves inside the minivan.

After the victim's grandson identified the body, an autopsy was performed. The victim's wrists and ankles had been bound together. The body had multiple bruises, scrapes, and lacerations. There was severe damage to the victim's head, including an extensive skull fracture. The doctor who performed the autopsy concluded that the cause of death was a blow to the head.

The victim's grandchildren identified the portable stereo as belonging to their grandfather. A search of Defendant upon his arrest uncovered a green coin purse, which was also identified by the victim's grandchildren as belonging to the victim.

Both Defendant and James Nelson were under the age of seventeen and were taken into custody of the juvenile court. Detective Wild * interviewed Defendant and James Nelson separately while in the presence of their parents. Defendant agreed to waive his rights and speak with Detective Wild. Defendant denied knowing about the murder. Defendant told Detective Wild that he got the minivan from Diatta Crockett. Defendant said he ran from the police because he thought the minivan

might have been stolen. Defendant admitted he knew the victim and had done some yard work for him in years past.

On October 10, the juvenile officer filed a petition in the juvenile court charging Defendant with tampering in the first degree and resisting arrest. Earlier that morning, Detective Wild received a call from Defendant's mother. Defendant's mother told Detective Wild that Defendant said he found the victim's wallet earlier in the day and put it in his bedroom dresser. Detective Wild sent an officer over to retrieve the wallet. Upon a warrant search of Defendant's room later that day, officers seized a latex glove and a tennis shoe with a spot of blood on it.

On October 11, after further questioning by Detective Wild, James Nelson led officers to two sewers where Defendant hid some items after removing them from the van. Officers found a pair of latex gloves in one sewer and in the other sewer, the victim's shotgun and his checkbook.

The police also spoke with Diatta Crockett and Tyrhan Hardy, both of whom observed Defendant driving the maroon minivan on the afternoon of October 9, 1996. Both saw a shotgun and a stereo inside the van. Both observed that Defendant was using a towel or a T-shirt to drive the minivan. When Tyrhan Hardy asked Defendant if the car was stolen, Defendant just smirked. When Diatta Crockett jokingly asked Defendant if he had killed somebody for the car, Defendant responded "something like that."

On October 14, the juvenile officer added charges of first-degree murder, first-degree robbery and unlawful use of a weapon to the petition charging Defendant. The juvenile officer then filed a motion to dismiss the juvenile case and certify Defendant as an adult. On November 19, 1996, the juvenile court held a certification hearing. Defendant was represented by counsel at the hearing. The juvenile court certified Defendant as an adult and transferred the case to the adult court.

Detective Wild was notified that Defendant had been certified as an adult. Detective Wild picked Defendant up from the juvenile detention center and took him to the police station for an interview. Detective Wild handed Defendant a "Waiver of Rights" form and read him his rights. Defendant signed the form and voluntarily agreed to speak. At first, Defendant made statements consistent with his previous statements. In the end, after being confronted with all the evidence against him, Defendant admitted he acted alone and killed the victim. Defendant's statement was taped. Defendant stated he went over to the victim's house to get the minivan. He wore latex gloves so he would not leave fingerprints. When Defendant demanded the keys, the victim refused. Defendant then retrieved some long underwear and tied up the victim. Defendant then put the victim, his stereo, and his shotgun in the minivan. The victim asked many questions and managed to kick Defendant. After becoming angry, Defendant pulled over and dragged the victim into a wooded area near a creek bed. The victim made noise, so Defendant hit him on the head twice with a big stick. Defendant then picked up a large block and struck the victim's head. At that point, the victim no longer made a noise. Defendant then went back to his mother's home where he did dishes, watched videos, and changed his shoes. Defendant took the money out of the victim's wallet and put it in his dresser. Defendant then picked up James Nelson from school. Along the way, Defendant ran into Diatta Crocket and others, who threw rocks at the minivan and broke out a window. Eventually, James Nelson convinced Defendant to dump the shotgun and latex gloves down a sewer drain. After his statement, Defendant agreed to do a reenactment of the events of that night for the police.

Prior to the trial, Defendant moved to suppress the statements made to Detective

Wild. The trial court denied the motion after a hearing. At trial, the State played Defendant's taped statement to Detective Wild to the jury. Defendant's objections were again overruled. In addition, the State presented testimony from a DNA expert who testified the blood found on Defendant's shoe was an exact match to the victim's blood. The expert testified the chances of blood coming from another individual were one in 5.5 billion.

Defendant testified on his own behalf. He denied any involvement in the murder and claimed he found the victim's wallet earlier that day. At the close of all the evidence, the jury found Defendant guilty of first-degree murder and the trial court sentenced him to life imprisonment without the possibility of parole.

In his first point, Defendant contends the trial court erred in overruling his motion to suppress and objection at trial to the admission of Defendant's statements to Detective Wild. Defendant asserts the statements were obtained in violation of his Sixth Amendment right to counsel. Because the police were aware that he was represented by counsel in his juvenile proceeding, they violated his rights by not contacting his attorney prior to taking the statements. We disagree.

Review of a trial court's ruling on a motion to suppress is limited to determining whether the evidence is sufficient to support the trial court's decision. *State v. Kampschroeder*, 985 S.W.2d 396, 398 (Mo.App. E.D.1999). Deference is given to the trial court's superior opportunity to determine credibility of witnesses. *State v. Rousan*, 961 S.W.2d 831, 845 (Mo.1998). As in all matters, a reviewing court gives deference to the trial court's factual findings and credibility determinations but reviews questions of law de novo. *Id.* The issue of whether the Sixth Amendment has been violated is a question of law, and therefore, we review de novo.

The Sixth Amendment right to counsel attaches only at or after the time

that adversary judicial proceeding have been initiated against a person. *State v. Parker*, 886 S.W.2d 908, 918 (Mo.1994); *State v. Beck*, 687 S.W.2d 155, 159 (Mo. banc 1985). Attachment of the right to counsel occurs at the initiation of adversary judicial proceedings against an accused by way of formal charge, preliminary hearing, indictment, information, or arraignment. *Beck*, 687 S.W.2d at 160. Once the right has been invoked, subsequent waiver during a police-initiated custodial interview is invalid. *Parker*, 886 S.W.2d at 918. The Sixth Amendment right is offense-specific and cannot be invoked for future prosecutions. *State v. Johnston*, 957 S.W.2d 734, 750 (Mo.1997); *State v. Williams*, 922 S.W.2d 845, 851 (Mo.App. E.D.1996).

Here, Defendant's Sixth Amendment right to counsel for the murder of the victim had not attached because formal proceedings had not begun. Defendant had not been indicted or charged in the adult court at the time of the interview by Detective Wild. In addition, any Sixth Amendment right to counsel that had attached in the juvenile proceeding did not transfer after Defendant was certified as an adult. *State v. Wilson*, 826 S.W.2d 79, 83 (Mo.App. E.D.1992). The certification proceeding was completed prior to his arrest as an adult. *See Id.* Moreover, Defendant voluntarily waived his rights and made the statements to Detective Wild. "The request for an attorney on a different matter does not vitiate any subsequent voluntary statements given without counsel by a defendant." *Id.* Thus, there is no Sixth Amendment violation.

Defendant further argues recent legislation allowing prosecutors to become more involved in juvenile court proceedings before transfer to adult court has blurred the line between juvenile proceedings and general criminal proceedings. Defendant cites Sections 211.068 and 211.071.5, RSMo Cum.Supp.1998, which allow prosecutors to review evidence assembled by juvenile officers and testify at the certification hearing. Defendant contends,

"[t]his new law was enacted after *Wilson* was decided, and it is questionable whether the court in that case would have found that juvenile and adult court were 'different matters' if the current statutory scheme would have been present." We are not persuaded. The fact that the statutes allow contact between juvenile officers and prosecutors does not dissolve the line between the juvenile system and the adult system. Point denied.

■ In his second point, Defendant asserts the trial court erred and abused its discretion in allowing the State to have Defendant lift a concrete block in front of the jury. We disagree.

■ The trial court is vested with broad discretion in admitting or rejecting demonstrative evidence, due to its superior vantage point for balancing the probative value of such evidence against its prejudicial effect. *State v. Candela*, 929 S.W.2d 852, 867 (Mo.App. E.D.1996). Demonstrative evidence which tends to establish any fact in issue or throw light on the issue and aids the jury in arriving at a correct verdict is admissible. *Id.*

Here, the State asked Defendant to pick up the concrete block, which the State claimed was the murder weapon. Defendant's objections were overruled and Defendant picked up the concrete block. The demonstration was appropriate to throw light on the issue of whether Defendant was capable of lifting the concrete block. Further, the demonstration would tend to aid the jury in arriving at the correct verdict by showing the jury that Defendant was capable of lifting the murder weapon. The trial court did not abuse its discretion in allowing the demonstrative evidence. Point denied.

The judgment of the trial court is affirmed.

CRANE, P.J., and SULLIVAN, J., concur.